**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE PRESS COALITION'S MOTION FOR ACCESS TO VIDEO EXHIBITS AND TO SET ASIDE STANDING ORDER NO. 21-28 | Case No. 21-cr-268-CJN |
| | Oral Argument Requested |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR**
**ACCESS TO VIDEO EXHIBITS AND TO SET ASIDE STANDING ORDER NO. 21-28**

BALLARD SPAHR LLP

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Lauren Russell (#1697195)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
russelll@ballarspahr.com

*Counsel for the Press Coalition*

## PRELIMINARY STATEMENT

No American can reasonably dispute the recent observation of the Court of Appeals for the District of Columbia Circuit: "[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The public's interest in the administration of justice has never been greater than it is with the criminal cases arising out of this dangerous threat to the peaceful transfer of authority. To reinforce the public's confidence in the stability of our government, the courts must ensure maximum public transparency for the unprecedented prosecutions in the Capitol Cases.

In this motion, Cable News Network, Inc., American Broadcasting Companies, Inc. d/b/a ABC News, The Associated Press, Buzzfeed, Inc. d/b/a BuzzFeed News, CBS Broadcasting Inc. o/b/o CBS News, Dow Jones & Company, Inc., publisher of The Wall Street Journal, The E.W. Scripps Company, Gannett Co., Inc., Gray Media Group, Inc., Los Angeles Times Communications LLC, publisher of The Los Angeles Times, National Public Radio, Inc., NBCUniversal Media, LLC d/b/a NBC News, The New York Times Company, Pro Publica, Inc., Tegna, Inc., and WP Company LLC, d/b/a The Washington Post (together, the "Press Coalition") seek to advance the public interest by obtaining videos that the Government submitted to this Court in Case No. 21-cr-268-CJN as evidence that Defendant Jeffrey McKellop should remain in detention pending trial. These videos (the "Video Exhibits") are judicial records to which the public has a right of access under both the First Amendment and common law. The Court should release them, without restriction, immediately.

Moreover, to fully vindicate the public's right of access, the Court also should set aside Standing Order No. 21-28 (BAH) (May 14, 2021) (the "Standing Order"), which unduly restricts transparency in this proceeding. While intended to facilitate access to the Video Exhibits, the Standing Order actually limits access here in three ways: (1) by default, it contravenes the

longstanding presumption of openness by permitting the Government to delay disclosure for

three days after any order to release videos; (2) it provides access to Video Exhibits only to

"credentialed" members of the press, and not the public; and (3) it presumptively restricts

republication of lawfully-obtained Video Exhibits without a finding that such a restriction

furthers a state interest of the highest order.

The need for contemporaneous, comprehensive access to the record of these prosecutions

is even clearer now, as bipartisan efforts to establish an independent commission to investigate

the Capitol riot have stalled in Congress.  *See* Ryan Nobles et al., *Senate Republicans block*

*January 6 commission*, CNN (May 28, 2021), https://www.cnn.com/2021/05/28/politics/january-

6-commission-vote-senate/index.html.  With the Legislative Branch deadlocked, and the

Executive Branch already responsible for prosecuting the Capitol Cases, the Judicial Branch

alone can offer the public an objective inquiry into the events of January 6.  This Court should

therefore ensure that these proceedings are as transparent as the Constitution and the common

law require.  The Court should make the Video Exhibits available to the public immediately and

without restrictions on their republication.

## BACKGROUND

### I.    The Riot At The United States Capitol

On January 6, 2021, thousands of rioters operating under "the guise of First Amendment-

protected activity" stormed the United States Capitol in a "blatant and appalling disregard for our

institutions of government and the orderly administration of the democratic process."  *See*

*Director Wray's Statement on Violent Activity at the U.S. Capitol Building*, FBI (Jan. 7, 2021),

https://www.fbi.gov/news/pressrel/press-releases/director-wrays-statement-on-violent-activity-

at-the-us-capitol-building-010721.  In response, federal law enforcement agencies "deployed

[their] full investigative resources . . . to aggressively pursue those involved in criminal activity."

.                                         2

*Id.* The Department of Justice has since charged more than 400 individuals, including the Defendant in this case, with crimes committed during the Capitol riot. *See, e.g.*, *Capitol Breach Cases*, Dep't of Justice, https://www.justice.gov/usao-dc/capitol-breach-cases.

According to the Department of Justice, "[t]he investigation and prosecution of the Capitol Attack will likely be one of the largest in American history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence." Mot. to Continue and Exclude Time at 1, *U.S. v. Caldwell*, No. 21-cr-28 (D.D.C. Mar. 12, 2021), Dkt. 73. Among that evidence is "more than 15,000 hours of surveillance and body-worn camera footage from multiple law enforcement agencies," *id.* at 2, including the Video Exhibits at issue in this motion.

## II.     This Case

On March 16, 2021, McKellop was charged with assaulting federal officers with a dangerous weapon, civil disorder, and obstruction of Congress, among other criminal violations. Crim. Compl., Dkt. 1. The Government alleges that McKellop "committed multiple assaults on different officers over the course of several minutes," and that his conduct "evince[d] an intent to target law enforcement officers for harm and to disrupt the legitimate functioning of government." *See* Gov't Mem. in Supp. of Pretrial Detention at 16, Dkt. 16.

Shortly after his arrest, the Government moved for Defendant's pretrial detention. *Id.* Magistrate Judge Zia M. Faruqui granted that motion on March 30, 2021 after a hearing on the matter. *See* Order of Detention Pending Trial, Dkt. 19. Defendant then moved for a revocation of that order, and at a subsequent hearing on April 5, 2021, Judge Carl J. Nichols denied that request. *See* Minute Order, Apr. 5, 2021.

## III.    The Video Exhibits

In requesting Defendant's detention pending trial, the Government asserted that McKellop "was captured in multiple videos recorded by officers wearing body worn cameras

that clearly show him violently engaging with the officers defending the Capitol that day."
*See* Dkt. 16, at 17.  In its briefing, the Government referred to several body-worn camera videos
submitted as exhibits to the Court that do not appear on the public docket.  *See id.* at 5, 9, 12.
Magistrate Judge Faruqui took this into consideration in ordering Defendant's detention,
characterizing as "strong" the Government's evidence – including "multiple videos of the
defendant assaulting law enforcement" – and noting that in one "particularly troubling" act of
violence Defendant appears to "wield[] a flag-pole and attempt[] to spear officers with it."  Order
of Detention Pending Trial at 3, Dkt. 19.

      In its response to Defendant's motion to revoke the detention order, the Government
incorporated by reference "four video exhibits" that had been "presented at the detention
hearing," and the Government argued that those videos "captured" Defendant's offenses.
*See* Opp. to Def.'s Mot. for Revocation or Review at 1-3, Dkt. 18.  At a subsequent hearing on
April 5, 2021, Judge Nichols expressly stated that he had reviewed "the four videos that the
Government has relied on as exhibits," noting that the Defendant "physically assaulted multiple
officers, as reflected in the videos I have watched."  Apr. 5, 2021 Hr'g Tr. at 21:22-23:24, 24:24-
25:6.  Based in part on his review of these videos, Judge Nichols subsequently denied
Defendant's motion and ordered that he remain in detention pending trial.  *Id.* at 26:12-21.

## IV.    The Standing Order

      This is not the Press Coalition's first effort to increase public access to the Capitol Cases.
On March 24, 2021, the Press Coalition moved for access to videos that had been shown in open
court and submitted as exhibits in support of detaining defendant George Tanios before trial.  *See*
Mot. for Access, *In re Application for Access to Certain Sealed Video Exhibits*, No. 21-mc-34-
TFH (D.D.C. Mar. 24, 2021) (seeking access to videos in *U.S. v. Tanios*, No. 21-cr-222-TFH-2).
The Government initially opposed releasing those videos, only to agree to produce them shortly

.                                  4

before a hearing was set to be held on the access motion.  *See, e.g.*, Katelyn Polantz, *Justice Department releases video of attack on Capitol Police officer*, CNN (Apr. 28, 2021), https://www.cnn.com/2021/04/28/politics/brian-sicknick-capitol-riot-videos/index.html.  Videos first shown in open court on March 22 were finally released on April 28, more than a month after the prosecution, defense counsel and the court viewed them in a public court proceeding.  In finally releasing these videos, the Government did not seek, and the court did not impose, any restrictions on the news media in sharing those videos with the public.

Subsequently, in an attempt to expedite disclosures of these court records moving forward, the Press Coalition wrote to Chief Judge Beryl A. Howell to request entry of a Standing Order directing the Government to proactively release all unsealed video exhibits in the Capitol Cases to a representative member of the press.  The press then would have been responsible for distributing the videos to other news organizations and making them accessible to the public. *See* Mot. to Access Video Exhibits, *In re Press & Public Access to Video Exhibits in the Capitol Riot Cases*, No. 21-mc-46-BAH (D.D.C. May 3, 2021).  The Chief Judge largely rejected that request.  Instead, the Standing Order permits the Government to unilaterally edit videos before releasing them, permits access only to a "member of the media with necessary access credentials provided by the government," and expressly prohibits any copying or redistribution:

> Members of the media seeking access to video exhibits submitted to the Court in Capitol Cases may file an application, pursuant to [Local Criminal Rule 57.6], to the presiding judge in the case, or if no judge has been assigned, to the Chief Judge, for determination, and the judge may seek the position of the parties.  Upon grant of such media application, the government shall make the video exhibit available to any member of the media with necessary access credentials provided by the government, unless the order otherwise limits access.  Members of the media provided access to video exhibits in a particular case pursuant to such order may view those exhibits using the "drop box" technical solution proposed by the [United States Attorney's Office for the District of Columbia].

No recording, copying, downloading, retransmitting, or further
broadcasting of video exhibits in a particular case is permitted,
unless such permission is granted by the presiding judge, who may
seek the position of the parties.

Standing Order at 5-6. [1]

## ARGUMENT

Strict application of the First Amendment and the common law are essential in all of the

Capitol Cases.  The Court should adhere to these protections and order the immediate release of

the Video Exhibits in this case.  Moreover, the Standing Order does not conform to the well-

established First Amendment and common law requirements for contemporaneous access to, and

the unrestricted right to redistribute, court records.  The Press Coalition therefore also asks this

Court to set aside the Standing Order.

**I.      The Court Should Release The Video Exhibits Immediately**

The Court should immediately release the Video Exhibits for two independently

sufficient reasons.  For one, because the First Amendment right of access applies to the Video

Exhibits, they should be released because neither the Government nor the Defendant could

possibly show that continued secrecy "is essential to preserve higher values and is narrowly

tailored to serve that interest."  *Dhiab v. Trump*, 852 F.3d 1087, 1102 (D.C. Cir. 2017)

(Williams, J., concurring).  For another, the common law access right also applies to the Video

Exhibits, and "[a]lthough [this] right is not absolute, there is a strong presumption in its favor,"

which cannot be rebutted on the facts of this case.  *See Metlife, Inc. v. Fin. Stability Oversight

Council*, 865 F.3d 661, 663 (D.C. Cir. 2017); *United States v. Jackson,* 2021 U.S. Dist. LEXIS

49841, at *13-24 (D.D.C. Mar. 17, 2021) (granting access to video exhibits under common law).

---

[1] The Standing Order is available at https://www.dcd.uscourts.gov/sites/dcd/files/SO%2021-
28_Pandemic_Media%20Access%20to%20Video%20Exs%20in%20Pretrial%20Capitol%20Cas
es_20210514.pdf.  For this Court's convenience, a copy is attached as Exhibit A to this motion.

**A.      The Court Should Release The Video Exhibits Under The First Amendment**

"The Supreme Court has sketched a two-stage process for resolving whether the First

Amendment affords the public access to a particular judicial record or proceeding." *Dhiab v.

Trump*, 852 F.3d 1087, 1102 (D.C. Cir. 2017) (Williams, J., concurring). "First the court must

determine whether a qualified First Amendment right of public access exists. If so, then . . . the

record or proceeding may be closed only if closure is essential to preserve higher values and is

narrowly tailored to serve that interest." *Id.* (internal marks and citations omitted). Here, the

right of access clearly attaches to the Video Exhibits, and neither the Defendant nor the

Government could possibly carry the weighty burden to overcome that right and justify

withholding them from the public.

**1.      The First Amendment access right attaches to the Video Exhibits**

Courts follow the "experience and logic" test to determine the constitutional right of

access to records or a proceeding. *Press-Enter. Co. v. Super. Ct.* ("*Press-Enterprise II*"), 478

U.S. 1, 9 (1986). Under this test, the right of access attaches if "the place and process have

historically been open to the press and general public" and if access "plays a significant positive

role in the function of the particular process." *Id.* at 8. Applying this test here, the constitutional

right of access plainly attaches to the Video Exhibits.

It is already well settled that "[t]he First Amendment guarantees a qualified right of

public access to criminal proceedings" and related judicial records. *In re Application of WP Co.*,

201 F. Supp. 3d 109, 117 (D.D.C. 2016) (citing *Globe Newspaper Co. v. Super. Ct.*, 457 U.S.

596, 603-04 (1982)). Moreover, this access right clearly applies to pretrial proceedings as well.

*See Press-Enterprise II*, 478 U.S. at 12-13 (holding that First Amendment right of access applies

to preliminary hearing in criminal case and observing that "the absence of a jury, long

recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and against

the compliant, biased, or eccentric judge, makes the importance of public access to a preliminary

hearing *even more* significant") (emphasis added and citation and internal marks omitted).[2]

These Video Exhibits were entered as exhibits in support of the Government's request

that Defendant be detained pending trial.  They therefore satisfy the experience and logic test and

fall under the First Amendment right of access.

### 2.    The First Amendment access right cannot be overcome on this record

Because this constitutional right of access applies to the Video Exhibits, the Court should

release them unless keeping them from the public "is essential to preserve higher values and is

narrowly tailored to serve that interest."  *Dhiab*, 852 F.3d at 1102 (Williams, J., concurring).

Specifically, to overcome the constitutional access right, the party seeking closure must

demonstrate that:

1. There is a substantial probability of prejudice to a compelling interest
   if the right is not limited.  *Press-Enterprise II*, 478 U.S. at 13-14.

2. There is no alternative to a limitation of the access right that will
   adequately protect against the threatened harm.  *Press-Enterprise II*,
   478 U.S. at 13-14; *Robinson*, 935 F.2d 282, 289-90 (D.C. Cir. 1991).

3. Restricting access will effectively protect against the threatened harm.
   *Press-Enterprise II*, 478 U.S. at 14; *Robinson*, 935 F.2d at 291-92.

4. The restriction on access is narrowly tailored to minimize the harm to
   the public's access rights.  *Press-Enterprise II*, 478 U.S. at 13-14;
   *Robinson*, 935 F.2d at 287.

---

[2] *See also In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir. 1984) ("The same policy
concerns that the Supreme Court identified when it found that the public has a First Amendment
right of access to criminal trials . . . operate in pretrial proceedings.  The decision to release on
bail an accused who subsequently flees the jurisdiction may effectively end the trial before it has
begun; the decision to hold an accused without bail deprives of his liberty a citizen who has not
yet been convicted of a crime.  In either case, the bail decision is one of major importance to the
administration of justice, and openness will help to assure the public that the decision is properly
reached.").

Nothing on the record suggests that keeping the Video Exhibits from the public is essential to preserve higher values.  Moreover, even if the Government or the Defendant could assert a potential risk of harm, and they cannot, they additionally would need to demonstrate that alternative measures cannot adequately redress that risk.  *Id.* at 290; *cf. In re NBC*, 653 F.2d 609, 613-17 (D.C. Cir. 1981) (applying this requirement to common law access test).  At no point in any of the Capitol Cases has the prosecution or defense attempted to make that showing.

Because the First Amendment right of access applies to the Video Exhibits, and there are no findings on the public record demonstrating that continuing to withhold them is essential to preserving any higher values, the Court should grant access to the Video Exhibits immediately.

### B.      The Court Should Release The Video Exhibits Under The Common Law

The Video Exhibits also should be released pursuant to the common law right of access.  "Although [this] right is not absolute, there is a strong presumption in its favor, which courts must weigh against any competing interests."  *Metlife*, 865 F.3d at 663.  Like the constitutional right of access, courts apply the common law right of access in a two-stage analysis.  First, courts determine whether the records at issue are "judicial records" to which there is a "strong presumption" in favor of access.  *Id.* at 665-67.  Once a court makes the determination that an exhibit or filing is a "judicial record," it applies the six-factor test set out in *United States v. Hubbard* to determine whether the party seeking closure has rebutted the "strong presumption" of public access.  650 F.2d 293, 317-21 (D.C. Cir. 1980).

For precisely the same reasons that Chief Judge Howell articulated in the *Jackson* case, the Video Exhibits are judicial records to which the public has a presumptive right of access under the common law.  *See Jackson*, 2021 U.S. Dist. LEXIS 49841, at *13-14 & n.3 (stating that "[d]ocuments and other materials filed in court intended to influence the court are judicial

Case 1:21-mc-00086-CJN   Document 1-1   Filed 06/07/21   Page 11 of 16


records" and clarifying that whether Video Exhibits were "filed on the public docket has no bearing on whether they are judicial records, since they are not in a format amenable to filing on the Court's Case Management/Electronic Filing (CM/ECF) system"). Neither the Defendant nor the Government can possibly rebut the resulting presumption of access under the *Hubbard* test. *See Jackson,* 2021 U.S. Dist. LEXIS 49841, at *13-24.

Moreover, as the D.C. Circuit has recognized, there is a particular "need for public access in those instances where the documents at issue are specifically referred to in the trial judge's public decision.'" *EEOC v. Nat'l Children's Ctr.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (internal marks omitted) (quoting *Hubbard*, 650 F.2d at 318). Here, the Court referred to video footage throughout its detention order and in denying Defendant's request for review. *See* Order of Detention Pending Trial at 3, Dkt. 19; Apr. 5, 2021 Hr'g Tr at 26:12-21. This Court therefore should grant public access to the Video Exhibits in this case pursuant to the common law as well.

## II.   The Court Should Set Aside The Standing Order

In releasing the Video Exhibits in this case, the Court also should set aside the Standing Order, as it does not provide the public with access to the Video Exhibits consistent with the First Amendment and common law. The Standing Order provides that the Court should (1) give the Government no less than 3 days to place the videos on an electronic "drop box"; (2) allow the Government to make the videos accessible only to "credentialed" members of the press; and (3) presumptively prohibit the press from recording, copying, downloading, transmitting, or otherwise publishing the videos to the public. *See* Standing Order at 5-6. Each of these provisions violates the First Amendment right of access. This Court therefore should exercise its authority and set it aside in this case. *See, e.g.*, *United States v. Ray*, 375 F.3d 980, 995 (9th Cir. 2004) (assessing constitutionality of challenged standing order); *United States v. Zingsheim*, 384

F.3d 867, 870 (7th Cir. 2004) (describing standing order as "problematic" and holding that the court can "address the legal status of the order in the course of assessing its application" in a particular case).

###### A.    The Standing Order Fails To Provide Contemporaneous Access

The Standing Order first fails by ignoring the principle that the right of access to court records and proceedings is a right of <u>contemporaneous</u> public access.  The Standing Order contemplates that the Government's "drop box" system will not make these Video Exhibits available to the public until "at least 72 hours" after the Court has ordered their release "in light of the possible need for redactions (e.g., personal identifiable information) and uploading of voluminous numbers of exhibits."  *See* Standing Order at 3.  But because the Video Exhibits are subject to the First Amendment and common law right of access, delayed release by default is simply not lawful.  "[T]he presumption of access normally involves a right of *contemporaneous* access."  *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1310 (7th Cir. 1984) (emphasis added); *see also Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) ("a necessary corollary of the right to access is a right to timely access"); *Lugosch v. Pyramid Co.*, 435 F.3d 110, 126 (2d Cir. 2006) ("Our public access cases and those in other circuits emphasize the importance of *immediate* access where a right to access is found.") (emphasis added).  The Court should therefore set the Standing Order aside and order the Government to release the Video Exhibits immediately.[3]

---

[3] The Standing Order's failure to provide prompt access is even more apparent now that the Press Coalition has actually submitted applications pursuant to the Standing Order.  The Clerk's Office has informed undersigned counsel that it will handle each access application as a separate miscellaneous action and that it will not open such an action until it receives a filing fee, which it accepts only via check or money order.  In practice, therefore, the process of applying itself holds up access to video exhibits by multiple days on top of the 72-hour delay addressed above.

**B.      The Standing Order Fails To Provide Access To The General Public**

The Standing Order also falls short of the First Amendment by relying on a system for releasing videos – the Government's electronic "drop box" – that fails to provide access to the general public.  In proposing the "drop box" system, the Government informed the Chief Judge that it may be incapable of providing access to "the general public" if requests become "too voluminous."  *See* Gov't Resp. to Court's May 5, 2021 Order, 4 n.2, *In re Press & Public Access to Video Exhibits in the Capitol Riot Cases*, No. 21-mc-46-BAH (D.D.C. May 6, 2021), Dkt. 5. Rather than require the Government to put forward a better system that provides access to the press and public on equal terms, or accept the Press Coalition's offer to assist,[4] however, the Court provided for narrowly restricting access and leaving the technical issues to the prosecution. It ordered the Government to "make the video exhibit available to *any member of the media with necessary access credentials provided by the government*."  Standing Order at 6 (emphasis added).

Providing access to the "credentialed" press but not to the general public violates the First Amendment.  As the Second Circuit explained in *Huminski v. Corsones*, which concerned the exclusion of a member of the general public from Vermont state courthouses, "the exclusion of any person undermines right-of-access principles in much the same way, if not to the same extent, as a blanket denial of access does: You cannot foster an appearance of fairness, thereby boosting community trust in the administration of justice, unless *any member of the public* – not

---

[4] The Press Coalition specifically offered that ProPublica, an independent, nonprofit news organization, could "serve as the press representative and take on the responsibility of receiving video exhibits from the Government, coordinating distribution of the videos to other press organizations, and making the videos accessible to the general public."  *See* Mot. to Access Video Exhibits at 8, *In re Press & Public Access to Video Exhibits in the Capitol Riot Cases*, No. 21-mc-46-BAH (D.D.C. May 3, 2021).

only members of the public selected by the courts themselves – may come and bear witness to what happens beyond the courtroom door." 396 F.3d 53, 83-84 (2d Cir. 2004) (emphasis added); *see also Co. Doe v. Pub. Citizen*, 749 F.3d 246, 263 (4th Cir. 2014) ("[T]he right of access is widely shared among the press and the general public alike, such that anyone who seeks and is denied access to judicial records sustains an injury.").

As the First Amendment and common law guarantee access to the Video Exhibits, this Court should not permit the Government to exclude the general public.  For this reason as well, the First Amendment and common law require the Court to set aside the Standing Order.

**C.     The Standing Order Presumptively Bars Constitutionally Protected Speech**

Finally, the Standing Order violates the First Amendment by its default provision enjoining the press from recording, copying, downloading, transmitting, or otherwise publishing the videos to the public.  *See* Standing Order at 6.[5]  In a series of cases over the past 50 years, the Supreme Court has strongly established that when the press "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Fla. Star v. B.J.F.*, 491 U.S. 524, 533 (1989).  As the Court summarized those cases:

> In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), we found unconstitutional a civil damages award entered against a television station for broadcasting the name of a rape-murder victim which the station had obtained from courthouse records.  In *Oklahoma Publishing Co. v. Oklahoma County District Court*, 430 U.S. 308 (1977), we found unconstitutional a state court's pretrial order enjoining the media from publishing the name or photograph of an 11-year-old boy in connection with a juvenile proceeding involving that child which reporters had attended.  Finally, in

---

[5] This provision also conflicts with the common law, which provides "'a general right to inspect *and copy* public records and documents, including judicial records and documents.'"  *Leopold v. United States*, 964 F.3d 1121, 1127 (D.C. Cir. 2020) (Garland, J.) (emphasis added) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)).

> *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), we found
> unconstitutional the indictment of two newspapers for violating a
> state statute forbidding newspapers to publish, without written
> approval of the juvenile court, the name of any youth charged as a
> juvenile offender.  The papers had learned about a shooting by
> monitoring a police band radio frequency and had obtained the
> name of the alleged juvenile assailant from witnesses, the police,
> and a local prosecutor.

*Id.* at 530-31.  Here, too, an order permitting journalists to view video exhibits, but forbidding

them from rebroadcasting the videos, violates the First Amendment.  The ban on redistributing

Video Exhibits of paramount public concern does not advance any cognizable interest, let alone

a state interest of the highest order.

To the contrary, the Government's interest here lies <u>in favor</u> of allowing the press to

rebroadcast the Video Exhibits.  As the Supreme Court recognized in its seminal access ruling,

the press often "function[s] as surrogates for the public" in providing access to judicial

proceedings, and "public understanding of the rule of law" necessarily depends on ensuring that

the press can "report what [they] have seen and heard."  *Richmond Newspapers v. Virginia*, 448

U.S. 555, 572-73 (1980).  Indeed, "[t]o work effectively, it is important that society's criminal

process satisfy the appearance of justice, and *the appearance of justice can best be provided by

allowing people to observe it*."  *Id.* at 571-72 (emphasis added).  In granting access to the Video

Exhibits, or any court record for that matter, the presumption <u>favors</u> republication of those

records for the public good.

Once journalists have access to video released by the Government, a judicial prohibition

against including them in news reports would act as a direct prior restraint on the press.  *See,

e.g.*, *United States v. Smith*, 123 F.3d 140, 155 n.17 (3d Cir. 1997) ("Under prior restraint law,

orders prohibiting the media from publishing information already in its possession are strongly

disfavored.").  In this respect as well, the Standing Order exceeds the courts' authority under the

.                                               14

First Amendment.  As with punishing publication after the fact, the Constitution does not permit a prior restraint absent a state interest of the highest order.  *See Smith*, 443 U.S. at 102 (noting that a prior restraint "requires the highest form of state interest to sustain its validity" and that "[p]rior restraints have been accorded the most exacting scrutiny").  No such interest exists here.

In establishing a presumption against publication, the Standing Order flips the First Amendment on its head.  For this reason as well, the Court should set aside the Standing Order and enter its own order granting access to the Video Exhibits in this case.

## CONCLUSION

For the foregoing reasons, the Press Coalition respectfully requests that the Court set aside the Standing Order and order the immediate and full release the Video Exhibits.

Dated:  June 7, 2021            Respectfully submitted,

                                      BALLARD SPAHR LLP

                                      */s/ Charles D. Tobin*
                                      Charles D. Tobin (#455593)
                                      Maxwell S. Mishkin (#1031356)
                                      Lauren Russell (#1697195)
                                      1909 K Street, NW, 12th Floor
                                      Washington, DC 20006
                                      Telephone: (202) 661-2200
                                      Fax: (202) 661-2299
                                      tobinc@ballardspahr.com
                                      mishkinm@ballardspahr.com
                                      russelll@ballarspahr.com

                                      *Counsel for the Press Coalition*